UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JAMEEL COLLINS,                                             **REPORT AND**
                                                            **RECOMMENDATION**
                              Plaintiff,

v.                                                          10-CV-00718(A)(M)

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                              Defendant.
_____

## INTRODUCTION

This case was referred to me by Hon. Richard J. Arcara to hear and report in accordance with 28 U.S.C. §636(b)(1) ([7]).[1] Before me are the parties' cross-motions for judgment on the pleadings pursuant to Fed. R. Civ. P. ("Rule") 12(c) ([13, 16]). For the following reasons, I recommend that defendant's motion for judgment on the pleadings be denied, and the plaintiff's cross-motion be granted in part and denied in part.

## BACKGROUND

Pursuant to 42 U.S.C. §405(g), plaintiff seeks review and reversal of the final decision of the Commissioner of Social Security denying his application Supplemental Security Income Benefits ("SSI"). Complaint [1]. Plaintiff filed an SSI application on July 6, 2006 alleging disability beginning January 1, 2006 (T79-81).[2] This claim was initially denied on October 20,

_____

[1]        Bracketed references are to CM/EMF docket entries.

[2]        Reference to "T" are to the certified transcript of the administrative record.

2006 (T70).  A hearing was held before Administrative Law Judge ("ALJ") William R. Pietz on

December 15, 2008 (T262-289).  Plaintiff was represented at the hearing by William Bernhardi,

Esq. (T262). On January 6, 2009 ALJ Pietz issued a decision denying plaintiff's claim (T9-15).

ALJ Pietz's determination became the final decision of the Commissioner, when the Appeals

Council denied plaintiff's request for review (T2-5).


A.      THE ADMINISTRATIVE RECORD

        1.      Medical Evidence

                Plaintiff (D.O.B: 4/17/1967) was diagnosed with human immunodeficiency virus

("HIV") in February 1991, and in December 1998 acquired AIDS (T215).  From January 2005

through November 2008, he was treated by the Erie County Medical Center ("ECMC")

Immunodeficiency Services Department (T132).  His primary doctor was Chiu-Bin Hsiao, M.D.

                Plaintiff was on an antiretroviral regimen of Trizivir and Kaletra (T230). On

February 2, 2005, plaintiff's CD4 level was 286 (Id.).[3]  On May, 27, 2005, plaintiff was seen for an

abscess on his buttocks, and a culture showed no viruses or organisms (T230, 254-256).  He was

prescribed Levaquin and Mepron (T230).  He was seen on June 6, 2005 for complaints of

sleeplessness (T228).  At that time, he was encouraged to stop smoking (T229).  On June 21,

2005, plaintiff complained of genital warts and was prescribed Aldara cream  (T227).

---

        [3]      "CD4 is an infection-fighting white blood cell that coordinates the immune response.
HIV infects and kills CD4 cells, weakening the immune system. CD4 count is a useful indicator of
immune system health and HIV/AIDS progression. A normal CD4 count is approximately 500 to 1,400
cells/mm 3 of blood, but individual counts can vary." Edel v. Astrue, 2009 WL 890667, *3 n.5 (N.D.N.Y.
2009).

On September 12, 2005, Dr. Hsiao noted that he had left-eye blindness and tinea versicolor, for which he was prescribed Clotrimizole cream (T226).  He also had genital warts (T224)  It was noted that he was "doing well" with respect to his AIDS, and had "[n]o diarrhea (id.).  His CD4 level was 278 (T224).   During this appointment he also stated that he felt fatigued, but that he had used Nutrivir in the past, which had helped (T225).  He was discouraged from using marijuana, which "may affect energy", and was encouraged to perform light exercise to improve his energy (id.).  He was also diagnosed with Hepatitis A (T226).

Plaintiff's abscess resurfaced in November 2005 (T223).  Plaintiff's CD4 level was 309 (T220).  At that time, his skin was otherwise normal (id.), and plaintiff's December 12, 2005 treatment record stated that he "still feels fatigued, but states most likely d/t lack of sle [sic] and using marijuana daily" (T222).  During this examination his skin was noted as being normal, other than for a tender spot over his left ear for which he received Neomycin cream (T221).  It was noted that he had "[f]requent staph aureus infections" (T221).

By January 23, 2006, it was noted that plaintiff's abscess had resolved (T220).  At that  time it was noted  that he had "no thrush" and his skin was normal (id.).  Plaintiff had complaints of "[l]ots of gas, reacts to food" and "constipation" (id.).  His CD4 level was 380 (T219).  On May 1, 2006, he complained of persistent shortness of breath and a cough, and "felt [that he] smokes too much" (id.).  He was also prescribed Wellbutrin for depression (id.).  At that time, his CD4 level was 395 (217).

 On June 26, 2006, plaintiff was diagnosed with a "fungal rash" and provided with Lotrisone cream, and provided with Acyclovir cream for his herpes (T217).  It was also noted that he had "pruritic lesions" (id.).  By August 21, 2006, it was reported that his fungal infection was

better (T157).  However, he was "feeling down the past couple of weeks" (id.).  On November 20, 2006 he reported that he was still smoking, but otherwise no abnormalities were noted (T155).  It was noted that he did have left eye blindness and that his CD4 level was up (T156).

On February 22, 2007, he had no complaints other than that he wanted to quit smoking (T154).  At that time, his CD4 level was 390 (T153).  On June 6, 2007, tinea versicolor was reported on his hands, and it was noted that a new prescription of Lotrisone was needed (id.).  Plaintiff was still smoking, but had been trying to quit (id.).  It was also noted that he had "no diarrhea" (id.).  His CD4 level was 444 (T151).  On August 7, 2007, he reported that he had a "scattered rash", and during a August 30, 2007 visit, he complaint that he "still has some . . . 'bumps on arm", but the physical exam of his skin noted that there were "no open areas" (T151).  As of August 30, 2007, he admitted to smoking 1-2 packs of cigarettes daily, but denied suffering from insomnia (T151).  His CD4 was 429 (T150).  On November 30, 2007,  a "hyperpigmented rash" was noted on his face (T150).   It was also noted that he had nicotine dependence (id.).

On February 29, 2008, it was noted that plaintiff "[h]as been sick", but no abnormalities of the skin were noted (T149).  At that time, his CD4 level was 485 (T146).  On April 11, 2008, plaintiff was noted as having a "depressed mood due to nephew in ICU"(T146).  At that time, his CD4 level was 226 and his skin was noted as being normal (T144, 147).

Plaintiff requested anti-diarrhea medication on April 25, 2008 because he "is out of same" and "needs . . . 90 day  supply for his insurance" (T145).  His request was approved for "2x/day 180" (id.).  No skin abnormalities were noted on July 25, 2008 (T144).  At that time, his CD4 level was 619 (T135).

Plaintiff was involved in a motor vehicle accident on September 16, 2008 (T137), and during an October 24, 2008 examination he complained of left knee pain that caused him to limp (T135).  His rash was noted as improving during his October 24, 2008 examination, and his HIV was "stable" and his "VL remains undetected" (id.).  It was also noted that he was suffering from depression and "tobacco abuse" (id.).  His dosage of Celexa was increased (id.).  At that time, his CD4 level was 436 (T133).

On November 13, 2008, he called ECMC complaining of a "new rash" consisting of little white bumps on both arms (T134).  A day later, he advised ECMC that his wife had the same rash and that his rash had spread to both of his legs (id.).  He was seen at ECMC on November 18, 2008,  and diagnosed with scabies and prescribed a cream (T133).

Plaintiff was also treated at Horizon's Bailey LaSalle Addiction Outpatient Clinic from January 29, 2008 through August 7, 2008 for cannabis dependence (T127).  His GAF upon admission was 49 and upon discharge was 60 (id.).[4]

---

[4]        "A GAF in the range of 41 to 50 indicates '[s]erious symptoms ( e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning ( e.g., no friends, unable to keep a job).'" Zabala v. Astrue, 595 F.3d 402, 406 (2d Cir. 2010) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 34 (4th ed. 2000). "A GAF between 51 and 60 indicates 'moderate symptoms' ... or 'moderate difficulty in social, occupational, or school functioning.' ". Kohler v. Astrue, 546 F.3d 260, 261 n. 1 (2d Cir.2008) (quoting DSM-IV, 32).

2.        **Consultative Examinations**

a.        **Internal Medicine**

An internal medicine examination was performed by Christine Holland, M.D., on August 26, 2006 (T206).  Plaintiff reported that "[o]ther than some fatigue, he has no symptoms and has not had any opportunistic infections", and that he was diagnosed four years ago with "early emphysema", but that it has not impacted his decision to stop smoking (id.).  He also reported that "[h]e cooks seven days a week and cleans once a week.  His sister does the laundry and shopping because it is too tiring. He can shower four days a week, bathe four days a week, and dresses seven days a week" (T207).  Dr. Holland's exam noted that his "[s]kin exam [was] within normal limits" with "[n]o significant adenopathy" (id.).  She diagnosed plaintiff with AIDS, blindness of the left eye and emphysema with "minor symptoms" (T208).  According to Dr. Holland, plaintiff "appear[ed] stable at this time", and "has no limitations other than the usual ones associated with HIV positive such as body fluids" (T209).

b.        **Psychiatric Examination**

A  psychiatric evaluation was conducted by Thomas Ryan, Ph.D, on August 29, 2006 (T210).  Plaintiff reported that he has "some difficulty with sleep and normal appetite" and "occasionally gets depressed about his health" (T210).  He uses marijuana two to three times per week (id.).  According to Dr. Ryan, plaintiff "can follow and understand simple directions and perform simple tasks.  He can maintain attention and concentration.  He can maintain a regular schedule unless his physical health interferes.  Capable of learning new tasks.  He may have some difficulty with complex tasks.  He can make adequate daily decisions and generally relate with

others.  Having difficulty dealing with stress.  Results of the evaluation are consistent with stress-related problems and in and of itself does not appear to be significant enough to interfere with his ability to function on a daily basis" (T212).   He was diagnosed with "[a]djustment disorder with depressed mood" (id.) and his prognosis was  "[f]air" (T213).

### 3.        Residual Functional Capacity ("RFC") Assessments

#### a.        Physical RFC Assessment

The assessment completed on October 3, 2006 by "K. Kriner"[5]  noted that plaintiff's primary diagnosis was "[a]symptomatic HIV", with a  secondary diagnosis of COPD (T181).  It concluded that"[n]o specific functional limitations are alleged - - claimant does indicate activities are limited somewhat by fatigue" (T184).

#### b.        Psychiatric Review Technique

The technique completed on October 3, 2006 by state agency review physician Hillary Tzetzo, M.D., concluded that the "[e]vidence does not support any significant limitations in the claimant's ability to perform the full range of mental work related functions and is therefore currently rated as non-severe" (T199).

---

[5]        It appears that this individual was a non-treating, non-examining agency employee *See* Dejesus v. Barnhart, 2007 WL 528895, *7 (W.D.N.Y. 2007)(Siragusa, J.).  "Such a consultant, however, is not an acceptable medical source".  Lawton v. Astrue, 2009 WL 2867905, *16 (N.D.N.Y. 2009).

4.        **Pulmonary Function Test**

The test conducted on September 12, 2006 concluded that plaintiff had "Normal Spirometry" (T201).

5.        **Administrative Hearing Conducted on December 15, 2008**

a.        **Plaintiff's Testimony**

At the outset of the hearing, plaintiff's counsel noted as a result of plaintiff's recurrent fungal infections, that it "might be a consideration for a decision under listing 14.08", but conceded that since a biopsy of the fungal infections was not performed that, "it's difficult to know what kind of fungal infection it is" (T265-266).

Plaintiff completed the 11th grade, and later acquired a GED while incarcerated (T281).  He estimated that he had 10 criminal convictions (T281-282).  Plaintiff concedes that he did not have much of a work record even before contracting HIV (T267).  He explained that he was "young and ignorant and lazy" and had only three jobs in his entire life because he had been "[a]ddicted to the . . . streets" (id.).

According to plaintiff, when he learned that he had AIDS, "it took [his] whole social life away" (T28).  When asked why he was consistently fatigued, plaintiff testified that he believed that it was "the medication and disease itself" (T267).  However, plaintiff conceded that his "viral load is undetectable" (id.).  He also testified that his diarrhea contributed to his inability to sleep (T275).

According to plaintiff, the longest period he has gone without a skin rash has been three weeks (T276). ALJ Pietz observed the rash to "be almost invisible in terms of size, they're

like pencil tips" (T277).  Plaintiff denied telling Dr. Holland that he did not suffer from

opportunistic infections (T280), and testified that she did not ask him to undress or to roll up his

sleeves (T279).

Plaintiff testified that he was unable to work because of his physical issues,

including "consistently [being] in the bathroom with . . . severe bouts of diarrhea", rather than due

to any mental problem (T268).  According to plaintiff, he was given "a prescription for some type

of over-the-counter antidiarrheal medicine" and took it "four times a day or as necessary" (T272).

He had enrolled at Horizon for mental health treatment and was scheduled for an intake

appointment on the day of the hearing (T268-270).

Plaintiff has seven children and their "mothers take care of them the majority . . . of

the time" (T270).  Three of the children resided with plaintiff, a newborn and his 14-year-old and

15-year-old daughters (T270).  His wife and mother assist him and care for the kids (T271).

Plaintiff testified that his daily activities include, "[s]it[ting] at home", "[r]un[ning] back and forth

to the bathroom", and "[s]leep[ing] a lot" (T266).  He takes his daughter once a week to

counseling (T273).  The only other thing he does outside of the house is to pick up his monthly

medication (T274).  He tries to clean the house, but does not "get very far", he  "might clean the

kitchen", but is "too exhausted to clean anything else" (T274).

### b.    Vocational Expert's Testimony

Vocational Expert Jay Steinbrenner was presented with the following hypothetical:

An individual with "a GED, simple instructions. No dealing with the
public. Occasional dealing with supervisors and coworkers. Light
exertion level.  Hazards, because of his eyesight. So, should avoid

-9-

> hazards.  That would include heights, unprotected heights,
> dangerous moving efficiency" (T282).

Mr. Steinbrenner testified that an individual with these limitations could be a "cleaner/

housekeeper" or be a "stock checker", unskilled light exertional work (T282-283).  According to

Mr. Steinbrenner, if "in an eight-hour day, taking into account your breaks and everything, you're

only productive for six hours out of that day", "[y]ou're not going sustain that employment"

(T286).

 

      **6.**      **ALJ Pietz's January 6, 2009 Decision**

      ALJ Pietz concluded that plaintiff had the following severe impairments:

"symptomatic immunodeficiency virus infection, chronic obstructive pulmonary disease, left-eye

blindness, and an adjustment disorder with depressed mood" (T11).  However, ALJ Pietz

concluded that plaintiff "does not have an impairment or combination of impairments that meets

or medically equals one of the listed impairments in Subpart P, Appendix 1, Subpart P, regulations

No.4" (id.).  In making this determination he noted that "[t]here is no evidence the claimant has

any of the conditions listed in section 14.08A-N or conditions of the severity contemplated

therein" (id).

      ALJ Pietz concluded that plaintiff had the RFC to "perform light work . . . except

that the claimant needs to avoid hazards such as unprotected heights and moving machinery;

cannot deal with the public; can only occasionally deal with co-workers and supervisors; and

cannot understand, remember or carry out more than simple instructions.  He should avoid dust,

fumes, gases, and temperature extremes" (T12).  He concluded that while plaintiff's "impairments

could reasonably be expected to cause the alleged symptoms . . . , the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC]" (T13).

ALJ Pietz noted that plaintiff is "receiving ongoing treatment [for AIDS] and is doing well. His viral load is undetectable and his CD4 cell count has been in the 300s and up into the 600s. The claimant told . . . [Dr. Holland] that he does not have any symptoms except for some fatigue, though the record reveals the claimant has been having some rashes and is positive for Hepatitis A. The claimant was encouraged to engage in some light exercise to increase energy" (T13-14).

ALJ Pietz found that plaintiff had no past relevant work, but relying on the testimony of the vocational expert, ALJ  Pietz concluded that "there are jobs that exist in significant numbers in the national economy that the plaintiff can perform" (T14-15). Based on plaintiff's age, education, work experience, and RFC, ALJ Pietz concluded that plaintiff was "not disabled" as defined in the Social Security Act since the his application was filed on June 5, 2006 (T15).


## ANALYSIS

### A.        Scope of Judicial Review

The Social Security Act states that, upon review of the Commissioner's decision by the district court, "the findings of the Commissioner...as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Substantial evidence is that which a

"reasonable mind might accept as adequate to support a conclusion". <u>Consolidated Edison Co. Of New York, Inc. v. NLRB</u>, 305 U.S. 197, 229 (1938).

Under this standard, the scope of judicial review of the Commissioner's decision is limited. This Court may not try the case *de novo*, nor substitute its findings for those of the Commissioner. *See* <u>Townley v. Heckler</u>, 748 F. 2d 109, 112 (2d Cir. 1984). Rather, the Commissioner's decision is only set aside when it is based on legal error or is not supported by substantial evidence in the record as a whole. *See* <u>Balsamo v. Chater</u>, 142 F. 3d 75, 79 (2d Cir. 1998). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the Court's independent analysis of the evidence may differ" from that of the Commissioner. <u>Martin v. Shalala</u>, 1995 WL 222059, *5 (W.D.N.Y. 1995) (Skretny, J.).

However, before deciding whether the Commissioner's determination is supported by substantial evidence, the court must first determine "whether the Commissioner applied the correct legal standard". <u>Tejada v. Apfel</u>, 167 F. 3d 770, 773 (2d Cir. 1999). "Failure to apply the correct legal standards is grounds for reversal." <u>Townley</u>, 748 F. 2d at 112.

**B.      The Disability Standard**

The Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age,

-12-

education, and work experience, engage in any other kind of substantial gainful work which exists

in the national economy. . . ." 42 U.S.C. § 1382c(a)(3)(B).

> The determination of disability entails a five-step sequential evaluation process:
>
> "1.    The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> 2.    If not, the Commissioner considers whether the claimant has a 'severe impairment' which limits his or her mental or physical ability to do basic work activities.
>
> 3.    If the claimant has a 'severe impairment,' the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations.  If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocations factors such as age, education, and work experience.
>
> 4.    If the impairment is not 'listed' in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity [("RFC")]to perform his or her past work.
>
> 5.    If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.  The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps."

Shaw v. Chater, 221 F. 3d 126, 132 (2d Cir. 2000).  *See* C.F.R. §§ 404.1520, 416.920.

> "New regulations, effective August 23, 2003, limit the Commissioner's burden at

step five.  *See* 20 C.F.R. 404.1560(c) . . . The Commissioner's step-four RFC determination (with

the claimant bearing the burden of proof) now controls at both steps four and five. . . .   The

Commissioner applies the RFC determination from step four to meet his burden at step five.

Using the claimant's RFC, the Commissioner must then show at step five that 'there is other

gainful work in the national economy which the claimant could perform.'" Spain v. Astrue, 2009

WL 4110294, *3 (E.D.N.Y. 2009).

In support of his motion for judgment on the pleadings, plaintiff argues that ALJ

Pietz "used an erroneous standard to determine whether plaintiff's HIV virus with recurrent

physical manifestations met or equaled the criteria of listings 14.08(B) and 14.08(K)" (plaintiff's

Memorandum of Law [15], p. 14), that ALJ Pietz did not fulfill his duty to develop the record (id.,

pp. 17-20), that ALJ Pietz's hypothetical fact pattern posed to the vocational expert was an

incomplete assessment of plaintiff's limitations (id, pp. 21-22), that ALJ Pietz erred by not calling

a medical expert to testify (id., pp. 22-23), and that ALJ Pietz erred in ascribing no weight to any

treating source statement based on plaintiff's subjective symptoms (id., pp. 23-25).


**C.      Did ALJ Pietz Err in Applying the Listings?**

"A claimant is automatically entitled to benefits if his or her impairment(s) meets

criteria set forth in 'the Listings.'  20 C.F.R. §404.1520(d). The burden is on the plaintiff to

present medical findings that show that his or her impairments match a listing or are equal in

severity to a listed impairment . . . .   In order to show that an impairment matches a listing, the

claimant must show that his or her impairment meets *all* of the specified medical criteria."

Damiano v. Astrue, 2010 WL 2652209, *3 (N.D.N.Y. 2010), adopted by 2010 WL 2652205

(emphasis added). "Any individual with HIV infection, including one with a diagnosis of acquired

immune deficiency syndrome (AIDS), may be found disabled under 14.08 if his or her impairment

meets the criteria in that listing or is medically equivalent to the criteria in that listing." 20 CFR Pt.

404, Subpt. P, App. 1.  Thus, "[a]n ALJ faced with an HIV-related disability must evaluate the

-14-

claimant's allegations under Listings 14.00 (immune system disorders) and 14.08." Bergeron v. Astrue, 2011 WL 6255372, *11 (N.D.N.Y. 2011).  Plaintiff challenges ALJ Pietz's determination that he did not meet the criteria of  Listings  14.08B and K. Plaintiff's Memorandum of Law [15], pp.14-17.

### 1.     Listing 14.08B

Under 20 C.F.R. Part 404, Subpart P, Appendix 1, section 14.08B a person is disabled if he is infected with HIV and has one of the following fungal infections:

"1.     Aspergillosis; or

2.     Candidiasis involving the esophagus, trachea, bronchi, or lungs, or at a site other than the skin, urinary tract, intestinal tract, or oral or vulvovaginal mucous membranes; or

3.     Coccidioidomycosis, at a site other than the lungs or lymph nodes; or

4.     Cryptococcosis, at a site other than the lungs (for example, cryptococcal meningitis); or

5.     Histoplasmosis, at a site other than the lungs or lymph nodes; or

6.     Mucormycosis; or

7.     Pneumocystis pneumonia or extrapulmonary Pneumocystis infection."

Plaintiff argues that "the hearing decision contained no mention whatsoever of Listing 14.08B, for fungal infections secondary to immunocompromise."  Plaintiff's Memorandum of Law [15], p. 16.  According to plaintiff, the "ALJ does not appear to have given any consideration to the existence of these fungal lesions in his decision", and argues that it was

-15-

"incumbent upon the [ALJ] to articulate reasons for ignoring the Listing".  Id., pp.16-17. In

conjunction with this argument, plaintiff alleges that he was diagnosed with a fungal rash on June

26, 2006 and has suffered repeated infections of a fungal nature since then, but that the specific

nature of the fungal rash was not determined, and suggests that it was incumbent upon ALJ Pietz

"to recontact plaintiff's treating source from purposes of obtaining and evaluating a diagnosis

pursuant to Listing 14.08(B)." Id., p. 17.

       Defendant responds that ALJ Pietz's determination that plaintiff did not meet

criteria for Listing 14.08B and 14.08K was supported by substantial evidence and that since "[t]he

ALJ specifically found that Plaintiff's HIV did not cause any of the conditions described in Listing

14.08 A-N to the severity contemplated therein[,] . . . Plaintiff's argument that the ALJ failed to

consider his HIV under Listings 1408B and K . . . is meritless".  Defendant's Memorandum of

Law [17], pp. 14-15.

       Before reaching the issue of whether ALJ Pietz's determination was supported by

substantial evidence, I must determine whether ALJ Pietz properly applied the Listing.  *See*

Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987) ("We must first decide whether HHS applied

the correct legal principles in making the determination.  We must then decide whether the

determination is supported by 'substantial evidence'").

       "Although . . . an ALJ  'should set forth a sufficient rationale in support of his

decision to find or not to find a listed impairment,' the absence of an express rationale for an

ALJ's conclusions does not prevent us from upholding them so long as we are 'able to look to

other portions of the ALJ's decision and to clearly credible evidence in finding that his

determination was supported by substantial evidence.'" Salmini v. Commissioner of Social

Security, 371 Fed.Appx. 109, 112 (2d Cir. 2010) (Summary Order) . *See* Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982)("[I]n spite of the ALJ's failure to explain his rejection of the claimed listed impairments", the court  may "look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence"); Roberts v. Astrue, 2011 WL 4056067, *7 (E.D.N.Y. 2011) ("Even if an ALJ's decision lacks an express rationale for finding that a claimant does not meet a SSA listing, a court may nonetheless uphold the ALJ's decision where portions of the decision and evidence before her indicate that her conclusion was supported by substantial evidence").  Only where the court is "unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ", it should not "hesitate to remand the case for further findings or a clearer explanation for the decision."  Berry, 675 F.2d at 469.

   Although ALJ Pietz might have better articulated his rationale for finding that plaintiff did not meet the 14.08B Listing, this is not a case in which I am "unable to fathom the ALJ's rationale in relation to evidence in the record".  Berry, 675 F.2d at 469.  *See* Batista ex rel. M.B. v. Astrue, 2010 WL 3924684, *7 (E.D.N.Y. 2010) ("Although the ALJ did not address these specific Listings, a court may uphold an ALJ's conclusions despite the absence of an express rationale as long as the court can look to other portions of an ALJ's decision as well as the credible evidence to find the decision supported by substantial evidence").

   In order to meet Listing 14.08B "[p]laintiff must present evidence of a diagnosis of HIV or AIDS and show a fungal infection".  Gibson v. Astrue, 2009 WL 5067757, *6 (M.D.Fla. 2009). However, he failed to do so.  *See* Cochran v. Astrue, 2011 WL 6399502, *6 (S.D.Ind. 2011) (finding that the ALJ's determination that plaintiff's condition did not meet or medically equal

Listing 14.08B was supported by substantial evidence where the "[t]he ALJ found no evidence, and indeed Cochran has produced none, to prove that his candidiasis" was of the type specified by the listing); Gibson, 2009 WL 5067757 at *6 (same).

I also reject plaintiff's argument that ALJ Pietz erred by not obtaining a diagnosis of his rash either by Dr. Hsiao or by a medical expert.  Plaintiff's Memorandum of Law [15], pp. 18, 22-23. When plaintiff's  recurring rash was identified, it was identified as tinea versicolor, not a qualifying fungal infection.  "[B]ecause the record provides sufficient evidence to support the ALJ's decision, the ALJ was not required to seek independent expert medical testimony before deciding Plaintiff's claim. . . .  Deciding medical equivalence is an issue reserved for the Commissioner, and in cases that proceed to the hearing level, the responsibility for deciding whether a claimant's impairments equal the criteria of a listed impairment rests with the ALJ. As discussed above, substantial evidence supports the ALJ's decision that plaintiff's impairments do not meet or equal Listing 14.08 and the ALJ did not need additional evidence to render her decision."  Gibson, 2009 WL 5067757 at *7.

### 2.      Listing 14.08K

Listing 14.08N was amended in June 16, 2008.  Bergtron, 2011 WL 6255372 at *11.  The parallel listing is now 14.08K.  See id.  It provides that:

> "Repeated  . . . manifestations of HIV infection, including those
> listed in 14.08A–J, but without the requisite findings for those
> listings (for example, carcinoma of the cervix not meeting the criteria
> in 14.08E, diarrhea not meeting the criteria in 14.08I), or other
> manifestations (for example, oral hairy leukoplakia, myositis,
> pancreatitis, hepatitis, peripheral neuropathy, glucose intolerance,
> muscle weakness, cognitive or other mental limitation) resulting in

-18-

significant, documented symptoms or signs (for example, severe
fatigue, fever, malaise, involuntary weight loss, pain, night sweats,
nausea, vomiting, headaches, or insomnia) and one of the following
at the marked level:

1.      Limitation of activities of daily living.

2.      Limitation in maintaining social functioning.

3.      Limitation in completing tasks in a timely manner due to
        deficiencies in concentration, persistence, or pace."

Plaintiff argues, *inter alia*, that his "clinical records from ECMC consistently refer

to the existence of persistent, recurrent diarrhea and fatigue" and that his "testimony describes

marked restrictions in activities of daily living as well as marked difficulty in maintaining social

functioning".  Plaintiff's Memorandum of Law [15], pp.15-16.  However, like the 14.08B Listing,

I am not unable to "fathom the ALJ's rationale in relation to evidence in the record".  Berry, 675

F.2d at 469.

It is evident from ALJ Pietz's decision that he  rejected  the plaintiff's subjective

complaints as being inconsistent with his RFC.  In doing so, ALJ Pietz  relied on  plaintiff's

statement to Dr. Holland that he only suffered from "some fatigue", his CD4 levels (300s to 600s),

undetectable viral load, and that plaintiff was "encouraged to engage in some light exercise to

increase energy (T13-14).  Therefore, I find no basis to conclude that ALJ Pietz did not properly

apply the Listings.


**D.      Did ALJ Pietz Fulfill his Duty to Develop the Record?**

"When the evidence we receive from your treating physician . . . or other medical

source is inadequate for us to determine whether you are disabled . . . . [w]e will first recontact

your treating physician . . . or other medical source to determine whether the additional

information we need is readily available." 20 C.F.R. §416.912(e).[6]  "Because a hearing on

disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation

to develop the administrative record. . . .  This duty exists even when the claimant is represented

by counsel".  Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996).  "Where an ALJ fails to adequately

develop the administrative record, remand is appropriate."  Fofana v. Astrue, 2011 WL 4987649,

*11 (S.D.N.Y. 2011), Report and Recommendation adopted by, 2011 WL 5022817.

   The record is largely bereft of any indication of the physical limitations associated

with AIDS and whether these may include chronic diarrhea or fatigue.  Significantly, in describing

plaintiff's physical limitations, Dr. Holland, the consultative examiner, concluded that plaintiff had

the "usual" limitations associated with AIDS, but failed to specify what these limitations were,

other than a vague reference to "body fluids" (T209).  Not only does this finding appear

inconsistent with the RFC Assessment that plaintiff's HIV was "[a]symptomatic" (T181), since

there was no medical source statement from plaintiff's treating source addressing his physical

capabilities,  Dr. Holland's assessment of plaintiff's physical limitations was critical to ALJ

Pietz's RFC assessment.  See Lawton v. Astrue, 2009 WL 2867905, *16 (N.D.N.Y. 2009) ("The

record . . . contains neither a physical RFC assessment nor a medical source statement pertaining

to plaintiff's physical capabilities, let alone one from a treating source. . . .  When critical record

voids exist, an ALJ is duty bound to take measures to complete the record and fill the perceived

gaps").

---

   [6]    This regulation was eliminated effective March 26, 2012.  See 77 FR 10651-01, 2011
WL 7404303.

As plaintiff argues, ALJ Pietz "would not be able to properly apply a collection of medical data to determine the Plaintiff's residual functional capacity".  Plaintiff's Reply Memorandum of Law [18], p. 8.   "[A]n ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence.  Where the 'medical findings in the record merely diagnose [the] claimant's exertional impairments and do not relate these diagnoses to specific residual functional capabilities such as those set out in 20 C.F.R. §404.1567(a) . . . [the Commissioner may not] make the connection himself.' " Deskin v. Commissioner of Social Security, 605 F.Supp.2d 908, 912 (N.D.Ohio 2008).  *See* Isaacs v. Astrue, 2009 WL 3672060, * 11 (S.D.Ohio 2009) ("The ALJ rendered her RFC finding for medium work without reference to any medically determined RFC opinion bridging the raw medical data to specific functional limitations.  Because there is no medical source opinion supporting the ALJ's finding that the plaintiff can perform 'medium' work, the Court concludes the ALJ's RFC determination is without substantial support in the record").  However, without any identification of the "ususal" limitations associated with AIDS, ALJ Pietz could not have filled this gap himself.

There was also a clear gap in plaintiff's medical records concerning his diarrhea.  His April 25, 2008 medical record indicated that he was out of anti-diarrhea medication and that he needed a 90-day supply (T145).  The notes reflect that "it is ok for . . . 2x/day 180#", suggesting that diarrhea was a chronic issue for which he was receiving treatment (id.).  Despite this, there is no other indication in the record of any treatment for diarrhea, thereby indicating a likely gap in the record.

The failure of ALJ Pietz to develop the record concerning plaintiff's symptoms and physical limitations associated with his AIDS is significant.  Plaintiff testified that he "spend[s] a good portion of the day in the bathroom" (T268) and that he is only able to clean the kitchen for 90 minutes before being too exhausted from doing anything else (T274).  If, upon filling the gaps in the record, these limitations were found to be consistent with his condition, it could impact the disability determination, as the vocational expert testified that if an individual is unable to work more than six hours out of an eight hour shift, they would be unable to sustain employment. "Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule". SSR 96-8P, 1996 WL 374184, *1 (S.S.A.).

Therefore, I recommend that this case be remanded for the ALJ to develop the record as to what are the physical limitations associated with plaintiff's AIDS.

**E.      Was the Hypothetical Posed to the Vocational Expert Complete?**

Based on ALJ Pietz's RFC assessment, I find no error with the hypothetical fact pattern posed to Mr. Steinbrenner.  However, since I have found that ALJ Pietz failed to develop the record with respect to plaintiff's RFC, if my recommendation is adopted, on remand the ALJ must ensure that the hypothetical questions posed to the vocational expert take account of plaintiff's full range of impairments that may result from changes to his RFC.

**F.     Did ALJ Pietz Err in Ascribing No Weight to the Treating Source Statements Based Upon Plaintiff's Subjective Symptoms?**

Plaintiff argues that it was reversible error for ALJ Pietz to attach no weight to his treating source statements based upon subjective complaints.  Plaintiff's Memorandum of Law [15], p. 23.  I acknowledge that ALJ Pietz did state in his decision that he "does not give weight to treating source statements that are based on the claimant's subjective statements" (T13).[7] However, as argued by defendant, "the ECMC physicians never offered medical opinions regarding his functionality, *i.e.*, statements reflecting judgments about the nature and severity of his impairments . . . ; thus, the ALJ could not assign or deny them any weight."  Defendant's Memorandum of Law [17], pp. 20-21.

Plaintiff also argues that ALJ Pietz "fail[ed] to take into account those factors set forth in SSR 96-7p in assessing credibility".  Plaintiff's Memorandum of Law [15], p. 23.  When a question of credibility arises, the decision of the ALJ must contain "specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear . . . the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7P, 1996 WL 374186, *4 (S.S.A.). The ALJ must consider the entire case record as well as factors such as:

"1.     The individual's daily activities;

2.     The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.     Factors that precipitate and aggravate the symptoms;

---

[7]     ALJ Pietz did cite to and rely on plaintiff's treatment records in rendering his decision. *See e.g.*, (T13).

-23-

4.      The type, dosage, effectiveness, and side effects of any
        medication the individual takes or has taken to alleviate pain
        or other symptoms;

5.      Treatment, other than medication, the individual receives or
        has received for relief of pain or other symptoms;

6.      Any measures other than treatment the individual uses or
        has used to relieve pain or other symptoms (e.g., lying flat
        on his or her back, standing for 15 to 20 minutes every hour,
        or sleeping on a board); and

7.      Any other factors concerning the individual's functional
        limitations and restrictions due to pain or other symptoms."

SSR 96-7P, 1996 WL 374186, *3 (S.S.A.).

Regarding plaintiff's credibility, ALJ Pietz found that plaintiff "alleges he is very

tired and has considerable diarrhea. He said he has only worked three times in his life because he

was lazy and 'addicted to the streets.'  He stated that he was arrested 10 times.  He said he has

seven children, three of whom live at home with him (one of them a newborn).  He said he takes

an hour to clean the kitchen.  He stated that he tries to sleep but wakens every four hours.  He

testified that he last used marijuana . . . in March 2008 but the record indicates that it was May

2008. . . .  [T]he claimant's credibility is reduced by his substance abuse, his multiple arrests and

his admitted unwillingness to work" (T13).  ALJ Pietz also noted that "[t]he claimant told . . . Dr.

Holland that he does not have any symptoms except for some fatigue . . .  The claimant was

encourage to engage in some light exercise to increase energy" (T13-14).  Moreover, he noted that

Dr. Ryan concluded that plaintiff's "symptoms could be related to alcohol withdrawal and drug

dependence consisting of current marijuana use" (T14).

-24-

"Although his findings do not explicitly indicate whether he considered each of the factors enumerated in the Regulations as outlined above, the court finds the reasons given by the ALJ sufficiently specific to conclude that he considered the entire evidentiary record". <u>Delk v. Astrue</u>, 2009 WL 656319, *4 (W.D.N.Y. 2009) (Curtin, J.).  ALJ Pietz set forth the basis for his determination in sufficient detail and "the court is not to second-guess the credibility of witnesses whom the ALJ has heard."  <u>Skehill v. Sullivan</u>, 1991 WL 120241, *2 (S.D.N.Y.1991).

However, if my Report and Recommendation is adopted, the ALJ may be required to evaluate plaintiff's credibility in light of any new medical information that is learned when the gaps in the administrative record are filled.

## CONCLUSION

For these reasons, I recommend that defendant's  cross-motion for judgment on the pleadings ([16]) be denied, and that plaintiff's motion for judgment on the pleadings ([13]) be granted in part and denied in part, and that the case be remanded to the Social Security Administration for further proceedings consistent with this opinion.  Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by May 28, 2012 (applying the time frames set forth in Fed. R. Civ. P. ("Rules") 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara.  A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". <u>Wesolek v. Canadair Ltd.</u>, 838 F. 2d 55, 58 (2d Cir. 1988); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

**SO ORDERED**.

DATED: May 11, 2012

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge